# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| **Daniel Barbosa** | **Luis Barbosa** | **Ramon Bueno** | § |
| 304 San Esteban | 308 San Esteban | 366 CR 135 | § |
| Mission, Texas 78572 | Mission, Texas 78572 | Alice, Texas 78332 | § |
| **Filiberto Chapa** | **Juanita Chavez** | **Maria de la Fuente** | § |
| 430 McMasters Rd. | 541 Villa | 4116 E. Lopez | § |
| Alice, Texas 78332 | Corpus Christi, Texas 78408 | Mission, Texas 78572 | § |
| **Irma Duarte** | **Rosemary Duron** | **Gamaliel Espinoza** | § |
| 3301 Kent Lane | 22848 Sunset Blvd. | 21206 N. La Homa Road | § |
| McAllen, Texas 78503 | San Perlita, Texas 78580 | Edinburg, Texas 78541 | § |
| **Oscar Gallegos** | **Armando Garcia** | **Alicia Gonzales** | § |
| 825 Nueces Street | 476 S. 1st | 723 W. Lochrie Ave. | § |
| Robstown, Texas 78380 | Raymondville, Texas 78580 | Raymondville, Texas 78580 | § |
| **Ruby Granados** | **Ricardo Hernandez, Jr.** | **Leticia Martinez** | § |
| 3702 Beatty St. | 308 N. Avenue F | 1323 Kansas Street | § |
| Mission, Texas 78572 | Bishop, Texas 78343 | Robstown, Texas 78380 | § |
| **Candido B. Mireles** | **Gilberto Mireles** | **Maria Moreno** | § |
| 1817 W Corpus Christi | 700 Washington Ave. | 237 Osage Street | § |
| Weslaco, Texas 78599 | Robstown, Texas 78380 | Corpus Christi, Texas 78405 | § |
| **Norberto Muñoz** | **Guadalupe V. Perez** | **Jesica Reyes** | § |
| 405 Heinsohn Street | 307 S. 4th Street | 734 McDonald St. | § |
| Robstown, Texas 78380 | Hidalgo, Texas 78557 | Corpus Christi, Texas 78418 | § |
| **Reynaldo Rosas** | **Armando Serna** | **Sylvia Silguero** | § |
| 3557 FM 2826 | 4324 2nd St. | 2443 Lindsey Dr. | § |
| Robstown, Texas 78380 | Banquete, Texas 78339 | Robstown, Texas 78380 | § |
| **Enedina Vela** | **Ramiro Villegas, Jr.** | ***La Unión del Pueblo Entero*** | § |
| 1316 E. Expressway 83 | 6526 S. FM 494 | 1601 E. Bus. Hwy 83 | § |
| La Joya, Texas 78560 | Mission, Texas  78572 | San Juan, Texas  78589 | § |
| | | | § |
| *Plaintiffs*, | | | § |
| | | | § |
| | | | § Civil Action No. |
| v. | | | § |
| | | | § 1:16-cv-__1843____ |
| **U.S. Department of Homeland Security** | | | § |
| 245 Murray Lane, S.W. | | | § |
| Washington, D.C.  20528-0485 | | | § |
| | | | § |
| **Federal Emergency Management Agency** | | | § |
| 500 C Street, S.W. | | | § |
| Washington, D.C.  20472 | | | § |
| | | | § |
| *Defendants*. | | | § |

## ORIGINAL COMPLAINT SEEKING INJUNCTIVE RELIEF

## INTRODUCTION

1.      This lawsuit challenges FEMA's use of secret rules to decide who gets disaster assistance, and how much each person gets.

2.      In three separate statutes, Congress directed FEMA to issue regulations stating the eligibility standards that it uses to carry out its Individuals and Households (IHP) disaster assistance program.  42 U.S.C. §§ 5151(a), 5174(j), and 5189a(c).

3.      After these statutes became effective on October 15, 2002, Presidents have declared over 800 major disasters (annual average of 57) and Congress has appropriated over $125 billion in disaster assistance for families and communities.  Pub. L. 106-390 §§ 205-06 (Oct. 30, 2000); https://www.fema.gov/disasters/grid/year (visited August 31, 2016); CONGRESSIONAL RESEARCH SERVICE, *FEMA's Disaster Relief Fund: Overview and Selected Issues*, NO. R43537 at 8-9 (May 7, 2014) (available at https://www.fas.org/sgp/crs/homesec/R43537.pdf visited August 31, 2016).

4.      FEMA's IHP regulations only repeat statutory text and state some general standards that FEMA "may" use to decide IHP eligibility.  *See* 44 C.F.R. §§ 206.110 to 119 (2015) ("may" qualifies eligibility criteria dozens of times).

5.      Courts, FEMA, and DHS agree that FEMA's disaster assistance publications are of poor quality.  *See LUPE v. FEMA*, 608 F.3d 217, 224-25 & n.3 (5th Cir. 2008) ("Even FEMA seems to implicitly recognize that [its IHP regulations] are rather poor .... One hopes that the new regulations FEMA is considering will give affected parties more guidance about whether the damage to their homes will count as 'disaster-related.'"); *Ridgely v. FEMA*, 512 F.3d 727, 741 (5th Cir. 2008) ("Examination of the notice letters and other correspondence found in the record convinces us that FEMA could measurably improve the navigability of its processes by providing applicants with more understandable explanations of its ineligibility determinations.");

*ACORN v. FEMA*, 463 F. Supp. 2d 26, 35 (D.D.C. 2006) (Judge Leon describes FEMA

eligibility explanations as "Kafkaesque."); DHS-OIG Audit OIG-05-20 at 23 (May 2005)

("[Disaster assistance] was hampered by several procedural omissions and generally weak

guidelines for performing inspections and documenting results.").

6.      Nobody outside FEMA can discern how FEMA decides eligibility for disaster assistance.

7.      FEMA has repeatedly refused to publish thousands of pages of its internal policy

manuals, which explain how FEMA decides eligibility for disaster assistance.  *See*

https://www.regulations.gov/document?D=FEMA-2016-0011-0085 (comment and exhibits

describing history of FEMA refusal to publish its policies).

8.      Plaintiffs are survivors of 2015 and 2016 Texas storms who seek all injunctive relief

necessary to prevent FEMA from using secret rules to decide disaster assistance applications in

violation of 5 U.S.C. § 552(a)(1) and 42 U.S.C. §§ 5151(a), 5174(j), and 5189a.

### PARTIES

9.      Twenty-six Plaintiffs are individuals who reside in the Texas counties of Hidalgo, Jim

Wells, Nueces, and Willacy.  Plaintiffs attach their declarations which detail how FEMA's use of

secret rules adversely affected them.  Document 1-1, Pages 1-61.  Each owns a home that was

damaged by FEMA Disaster Nos. 4223, 4245, or 4272.  Each applied to FEMA for assistance.

FEMA denied some or all of the home repair assistance sought by each Plaintiff without ever

stating the complete legal standards or facts that FEMA relied upon to deny assistance.

10.     Plaintiff *La Unión del Pueblo Entero* (LUPE) is a non-profit membership organization

that César Chávez founded in 1989 as a sister organization to the United Farmworkers of

America.  LUPE's mission is to assist low-income families in exercising their rights as

employees, consumers, and full participants in the civic affairs of the communities where they

live.  LUPE's membership includes 25,000 people in 7,000 families who primarily communicate

in Spanish.  LUPE provides educational, advocacy, and organizing services to members and non-

members primarily in Texas's Hidalgo and Cameron Counties.  LUPE helps people with

everything from income taxes to immigration to job training and educational opportunities.

LUPE activities include large group meetings at LUPE's union hall in San Juan, Texas, house

meetings, counseling sessions with LUPE members and volunteers, referral services, classes,

organizing drives, presenting testimony to government officials, marches and demonstrations,

and responding to requests for information concerning government programs.  In serving

members and the public at large, LUPE has historically been involved in disaster recovery efforts

by organizing meetings with government officials including FEMA, by informing members and

the public how to access all forms of disaster assistance from federal, state, local and private

sources, and by advocating for disaster recovery resources.  LUPE's mission and activities are

accurately described on its website, www.lupenet.org.

11.     Defendant Federal Emergency Management Agency (FEMA) is part of the United States

Department of Homeland Security.  FEMA is an agency of the United States of America having

responsibility for administration of disaster assistance to individuals and households under the

Stafford Act.  6 U.S.C. § 314(a)(8); Exec. Order No. 12,673, 54 Fed. Reg. 12,571 (Mar. 23,

1989).  FEMA headquarters is situated in the District of Columbia.

12.     Defendant United States Department of Homeland Security (DHS) is the cabinet-level

agency in the United States Government that includes FEMA.  DHS approves FEMA's budget

and regulatory agenda prior to annual presentation of these items to the Office of Management

and Budget and the White House, and is responsible for ensuring that FEMA fairly carries out its

disaster assistance activities.  6 U.S.C. §§ 111(b)(D)-(G); *id.* at § 112(a).  DHS headquarters is situated in the District of Columbia.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  All of Plaintiffs' claims arise under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Defendant FEMA is headquartered in this District and because the events giving rise to this litigation occurred in this District.

## SIMILAR FEDERAL LITIGATION

15.     Plaintiffs' counsel made several of the deficiencies described in this lawsuit known to FEMA in October 2008 following Hurricane Dolly, FEMA Disaster No. 1780.

16.     Litigation against FEMA over the Dolly applications remains pending in the U.S. District Court for the Southern District of Texas.  *See* Civil Action No. 08-cv-487 (S.D. Tex.), Docket available at https://ecf.txsd.uscourts.gov/cgi-bin/ShowIndex.pl.

17.     The Dolly litigation is not "related" to this case under D.D.C. Local Rule 40.5(a)(3) because it arises from entirely different events (FEMA Disaster Nos. 4223, 4245, and 4272), it involves entirely different individual Plaintiffs, and must be decided using an entirely distinct administrative record as provided in D.D.C. Local Rule 7(n)(1).

18.     This case does raise legal issues similar to those presented in the Dolly litigation, some of which so far have been decided in favor of disaster applicants, and others in favor of FEMA.  *See LUPE v. FEMA*, 141 F. Supp. 3d 681 (S.D. Tex. 2015).

## ORGANIZATIONAL STANDING

19.     LUPE has representational standing to bring this suit on behalf of its members because:

(a) LUPE members, including Antonio Carrisales, whose declaration is attached as Document 1-1 at 9-10, would otherwise have standing to sue in their own right;

(b) LUPE seeks to protect interests that are germane to LUPE's mission and purpose; and

(c) neither the claims asserted nor the relief requested requires participation of individual LUPE members in the suit, for all claims at issue depend on FEMA's adoption of unpublished standards and not on the facts that FEMA relied upon to decide any individual application, and LUPE seeks identical relief for all applicants involved in Disaster Nos. 4223, 4245, and 4272, and no individualized relief whatsoever.

20.    LUPE has direct standing to bring this suit on its own behalf because FEMA's illegal actions caused the following injuries to LUPE that would be addressed by a favorable ruling:

(a) LUPE is a consumer of government information, and FEMA's failure to supply information required by statute prevents LUPE from serving its members, growing as an organization, and pursuing its mission;

(b) FEMA's illegal actions increase the costs that LUPE must spend (in money and volunteer time) to help disaster survivors understand what actions they need to take to gain fair access to disaster assistance; and

(c) FEMA's illegal actions cause LUPE to divert resources and attention from its other priorities, which impedes LUPE's ability to pursue its mission.

## STATEMENT OF FACTS

### A.    Statutory and Regulatory Background

21.    Since 1974 the Robert T. Stafford Disaster Relief and Recovery Act (Stafford Act) has governed the federal response that is invoked each time a President declares a "major disaster." Pub. L. 93-288, § 101 (May 22, 1974) (codified at 42 U.S.C. § 5121, *et seq*. (as amended)).

22. FEMA administers some dozen Stafford Act programs, and its two largest in terms of cost are:

(a) the Public Assistance Program (PAP), which provides federal money directly to state and local governments, tribes, and non-profits for several purposes, one of which is to repair public facilities that are damaged by a major disaster, 42 U.S.C. § 5172; and

(b) the Individuals and Households Program (IHP), which provides federal money directly to individuals and households for several purposes, one of which is to repair private homes that are damaged by a major disaster, 42 U.S.C. § 5174.

23. PAP and IHP first took effect for all disasters declared after October 15, 2002. PAP and IHP were created by the Disaster Mitigation Act of 2000, which amended the Stafford Act to replace prior recovery programs. Pub. L. 106-390 § 205 (PAP) and § 206 (IHP) (Oct. 30, 2000).

24. Since October 15, 2002, Presidents have declared over 800 major disasters.

25. Since October 15, 2002, FEMA has distributed over one-hundred-and-twenty-five billion dollars through PAP and IHP, roughly 70% PAP and 30% IHP.

26. FEMA administers PAP and IHP using what it has described as this "hierarchy" of "governing documents:"

(a) first is the statute establishing each program (42 U.S.C. § 5172 for PAP and 42 U.S.C. § 5174 for IHP);

(b) second are the regulations implementing each program (44 C.F.R. Part 206, Subparts G-I for PAP and 44 C.F.R. Part 206, Subpart D, §§ 206.110 to 119 for IHP); and

(c) third are FEMA PAP and IHP "policies" which are issued by FEMA Headquarters to "clarify or provide direction for specific situations that arise in the implementation of

Stafford Act provisions and various regulations," and to "ensure consistent implementation of programs across the Nation."

27. The Stafford Act requires FEMA to establish IHP eligibility criteria by published regulation in the following provisions:

(a) 42 U.S.C. § 5151(a) (FEMA "shall include [in its disaster assistance regulations] provisions for insuring that ... the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of ... economic status.");

(b) 42 U.S.C. § 5174(j) (FEMA "shall prescribe rules and regulations to carry out this section, including criteria, standards, and procedures for determining eligibility for assistance."); and

(c) 42 U.S.C. § 5189a(c) (FEMA "shall issue rules which provide for the fair and impartial consideration of [IHP] appeals.").

**B.      Unpublished IHP Policies**

28. FEMA publishes its PAP policies in the Federal Register and on the Internet, and explicitly states that all PAP policies appear there. *See* http://www.fema.gov/public-assistance-policy-and-guidance (visited August 31, 2016) ("Any policy or guidance document not superseded by [FEMA's comprehensive PAP guide] is provided below.").

29. FEMA has not published its IHP policies anywhere, although it has stated that it intends to publish some of them in the future.

30. FEMA's IHP policies are contained in thousands of pages of memoranda, manuals, guidelines, standard operating procedures, numbered policy catalogues, and agency directives.

31.     Some of FEMA's IHP policies are marked secret, for agency internal use only, and not for public release.

32.     FEMA IHP policies remain in force indefinitely, and rarely change from disaster to disaster.  Some IHP policies have been in force without alteration since IHP's inception in October 2002.

33.     FEMA publishes an average of 500 notices of its actions in the Federal Register each year, including notices during responses to major disasters, but it has never published its IHP policies in the Federal Register.

### C.     Home Repair Statute, Regulation, and Policy

34.     Home repair is but one of several forms of disaster assistance that Congress makes available to families under IHP.  *See* 42 U.S.C. § 5174 (describing all forms of assistance); *id.* at 5174(c)(2) (describing home repair assistance).

35.     Congress caps the total amount of all forms of IHP disaster assistance at an inflation-adjusted $25,000 per household.  *Id.* at § 5174(h).

36.     Home repair assistance does not cover insured losses.  Otherwise, means testing of home repair assistance is forbidden, making it available to families regardless of their income or assets. *Id.* at 5174(c)(2)(B).

37.     Three statutory IHP home repair eligibility criteria are at issue in this litigation:

        (a) **Ownership**: the home must be an "owner-occupied" primary residence;

        (b) **Disaster-Related**: assistance is only available to repair "disaster-related" damage to the home; and

        (c) **Habitability**: repair of disaster-related damage must be necessary to render the home "habitable."

42 U.S.C. §§ 5174(b)(1) and (c)(2).

38.     FEMA's IHP regulations take three markedly different approaches to the three statutory

IHP eligibility criteria:

> (a) **Ownership:** the text of the regulations themselves provide adequate public notice of
>
> how FEMA decides which homes are owner-occupied primary residences, *see* 44 C.F.R.
>
> § 206.111 (defining "owner-occupied" and "primary residence");
>
> (b) **Disaster-Related**: the regulations only repeat the statutory term "disaster-related"
>
> without providing any notice at all of how FEMA decides which damages are disaster-
>
> related, 44 C.F.R. §§ 206.110-19; and
>
> (c) **Habitability:** the regulations define the statutory term "uninhabitable" to mean "not
>
> safe, sanitary, or fit to occupy," and then define the statutory terms "safe," "sanitary," and
>
> "functional" so broadly that the definitions provide the public with no effective notice at
>
> all of how FEMA decides habitability, 44 C.F.R. § 206.111 ("*Functional* means an item
>
> or home capable of being used for its intended purpose ...  *Safe* means secure from
>
> disaster-related hazards or threats to occupants ... *Sanitary* means free of disaster-related
>
> health hazards [and] *Uninhabitable* means the dwelling is not safe, sanitary or fit to
>
> occupy.").

39.     FEMA uses many unpublished IHP policies to decide which damages are disaster-related,

and which repairs are necessary to render a home habitable, including without limitation,

documents entitled:

> (a) Standard Operating Procedures
>
> (b) Inspection Guidelines
>
> (c) IHP Line Items

(d) Response & Recovery Directorate Guidance

(e) FEMA Memorandum

(f) FEMA Processing Manual

(g) Policy and Guidance Quick Reference Guide

(h) IHP Toolbox

(i) Habitability Document

(j) Field Inspector Manuals

(k) Processing Manuals

(j) Pre-Shift Instructions

40.    Many of FEMA's unpublished IHP policies narrow eligibility for home repair assistance, including without limitation:

(a) setting caps and floors for amount of assistance regardless of disaster damage;

(b) excluding certain items from repair regardless of disaster damage;

(c) presuming pre-existing damage when FEMA is uncertain whether a disaster caused observed damage; and

(d) imposing restrictive standards of proof for disaster causation and habitability.

**D.    How FEMA Applies Policies to Decide Individual Applications**

41.    Each time a disaster assistance application indicates that an applicant is legally present in the United States, lives in a home within the declared disaster area, and claims home damage from a declared major disaster, FEMA dispatches an inspector to conduct an initial inspection of the home.

42.    Inspectors are rarely employed by FEMA.  Instead FEMA pays inspection management companies to recruit inspectors.  These companies do not supply their own employees either.

11

Instead the companies recruit individuals willing to work as independent contractors who are paid a flat rate of about $50 per inspection. *See* https://www.fema.gov/faq-details/Employment-as-a-home-inspector-with-FEMA-1370032123050 (visited August 31, 2016).

43.     FEMA permits inspection management companies to use a criminal background check as the sole basis for screening people who want to work as independent-contractor inspectors. FEMA does not specify any education, certification, or experience requirements for inspectors.

44.     Inspection management companies make training available to inspectors. This training describes how FEMA expects inspectors to do their jobs.

45.     FEMA does not require inspectors to have undertaken any training prior to being deployed to a disaster. Inspectors have widely varying levels of training and experience.

46.     Inspectors record information as directed by FEMA according to FEMA policies that are programmed into an electronic device provided by FEMA.

47.     FEMA requires IHP applicants to appear on site at each inspection, positively identify themselves, and swear to accurately answer the inspector's questions on pain of criminal penalty.

48.     FEMA directs inspectors to ask specific questions and record specific information showing (a) whether the inspector concludes that the applicant owns the home; and (b) what documents or other facts the inspector relies upon to reach a conclusion as to ownership.

49.     Although the applicant is still present on-site and still effectively under oath, FEMA does not require inspectors to discuss with the applicant, or record anything about, what damages the applicant claims were caused by the disaster. Much to the contrary, inspectors commonly refuse to discuss disaster damages with applicants on-site.

50.     FEMA regularly confronts at least two difficulties in deciding which damages are disaster-related:

(a) because inspectors only observe damages after a disaster, in some cases they may not

have any way to definitively discern which damages existed prior to the disaster (fact-

finding expertise); and

(b) because disasters damage perfect and imperfect homes alike, FEMA must often

decide whether an item that was likely deficient to some extent prior to the disaster was

sufficiently damaged by the disaster to warrant repair assistance (dual-causation).

51.     FEMA uses unpublished rules to instruct inspectors how to make these two decisions.

52.     FEMA directs inspectors to tour the home and record only the type and quantity of

damages that the inspector feels were caused by the disaster.  FEMA records nothing else about

what damages are disaster-related.  FEMA does not direct inspectors to record anything about

doubts or concerns that an inspector may have about which damages are disaster-related.

53.     Inspectors record and supply to FEMA only information that FEMA directs the inspector

to record concerning which homes are owner-occupied, which damages are "disaster-related,"

and which homes are "habitable."  The recordings consist of text, photographs, and form entries

made in an electronic device programmed by FEMA to record the information that FEMA uses

to issue its home repair decisions.

54.     FEMA relies exclusively upon information recorded by its inspectors to make its disaster

assistance decisions.  FEMA uses information supplied by applicants only to direct the activities

of its inspectors.

55.     FEMA does not require inspectors to record any information about the reasons for their

"disaster-related" and "habitability" decisions.

56.     FEMA does not require inspectors to share any information with applicants about what

damages were recorded as disaster-related or whether the home is recorded as habitable.

57.     FEMA does not tell applicants that FEMA's home repair decisions are based exclusively upon information collected by its inspector.

58.     Inspectors electronically transmit data describing each inspection to FEMA.

59.     FEMA computers read the inspection data and issue initial decisions in about 95% of cases without any further human involvement at all.

60.     FEMA sends each applicant an initial decision letter that is a computer-generated form.

61.     One of FEMA's form letters is its "EHR" (Eligible for Home Repair) letter.  This letter notifies applicants that they are eligible for home repair assistance and the amount of assistance that FEMA will provide.  The letter provides no information about how FEMA calculated the precise amount of repair assistance to be provided.

62.     Another of FEMA's form letters is its "IID" (Ineligible—Insufficient Damage) letter. Quoted next is the complete and only explanation that FEMA provides for why it denies home repair assistance:

> We recognize how difficult a time this is for you and your family and we understand that many people need help following a disaster. We are committed to providing you any help we can, including important information to begin your recovery.
>
> The Federal Emergency management Agency (FEMA) and State of Texas have carefully considered all available information regarding your request for assistance. Our decision(s) about your request is listed below:
>
> CATEGORIES              DETERMINATION
> ===============         ===========
> Housing Assistance      IID - Ineligible - Insufficient Damage
> Total Grant Amount:     $0.00
>
> **IID – Ineligible – Insufficient Damage**
>
> Based on your FEMA inspection, we have determined that the disaster has not caused your home to be unsafe to live in.  This determination was based solely on the damage to your home that is related to this disaster.

14

Although the disaster may have caused some minor damage, it is reasonable to expect you or your landlord to make these repairs.  At this time you are not eligible for FEMA housing assistance.

If you do not agree with our decision, you have the right to appeal.  Please send us documents such as a statement from local officials, contractor estimates, etc. to show that the damage to your home was caused by the disaster and has caused unsafe or unlivable conditions.

63.     FEMA's IID letter leaves applicants to guess among the following possible reasons for denial of home repair assistance:

(a) the inspector did not observe any damages;

(b) the inspector did not record observed damages as disaster-related;

(c) disaster-related damages did not cause the home to be unsafe;

(d) disaster-related damages were not the primary cause of the home being unsafe; or

(e) disaster-related damages that caused the home to be unsafe were *de minimis*.

64.     FEMA's IID letter states no applicant-specific facts at all, and nothing about what the inspector recorded that produced the adverse decision.

65.     FEMA notifies dissatisfied applicants that they may file an appeal under oath.

66.     FEMA's IHP regulations provide the following material information about appeals:

(a) applicants may appeal "any eligibility-related decision;"

(b) appeals must be signed "in writing and explain the reason(s) for the appeal;"

(c) appeals must be addressed to FEMA's Regional Administrator or designee;

(d) applicants or their authorized representatives "may ask for a copy of information in his or her file by writing to FEMA;"

(e) all appeals must be filed "within 60 days after the date that we notify the applicant of the award or denial of assistance;" and

(f) every "decision of the appellate authority is final."

44 C.F.R. § 206.115 (2015).

67.    FEMA's appeal regulation does not notify applicants that FEMA maintains a set of secret

appeal policies that narrow the right of appeal, including without limitation:

      (a) absolute prohibitions on certain types of appeals for specific disasters (for example,

      FEMA has previously issued orders pre-emptively denying all appeals involving roofs,

      carpet replacement, and whole roof replacement);

      (b) requiring licensed contractor estimates as a condition of appeal regardless of whether

      applicants can afford the high cost of estimates following a disaster, regardless of

      whether contractors are licensed and available in the state, and without telling applicants

      that every contractor estimate will be automatically rejected if the contractor does not

      answer FEMA's first phone call or if the estimate lacks details that FEMA has never set

      forth as requirements;

      (c) requiring contractors to swear to causation determinations as a condition of appeal

      when contractors are never told what standard of proof FEMA expects them to apply in

      determining causation; and

      (d) procedures that impede applicants from timely accessing their complete files that

      contain the facts that FEMA has recorded concerning their applications.

      **E.**     **Secret Rules Adversely Affect Applicants, Including Plaintiffs**

68.    After personally watching a disaster cause serious damage to their homes, families across

the nation regularly complain to FEMA that they cannot understand how FEMA could deny

home repair assistance due to "insufficient damage."

69.    In recent years a series of massive inland unnamed storms have battered and flooded

states bordering the Gulf of Mexico.

70.     Storms repeatedly brought torrential rains, wind, and flooding to Central and South Texas in 2015 and 2016.

71.     Following these storms, President Obama declared Disaster Nos. 4223, 4245, and 4272 to be major disasters and made IHP assistance available in the counties where Plaintiffs live.

72.     FEMA published federal register notices during Disaster Nos. 4233, 4245, and 4272, but none state what standards FEMA would use to decide IHP applications following these disasters. *See, e.g.*, 80 FED. REG. 35966 (June 23, 2015); 81 FED. REG. 1962 (January 14, 2016); 81 FED. REG. 43625 (July 5, 2016).

73.     Over 50,000 households total applied for IHP assistance following Disaster Nos. 4223, 4245, and 4272.

74.     Plaintiffs' declarations are attached and incorporated for all purposes pursuant to FED. R. CIV. P. 10(c), specifically to prove Plaintiffs' standing and adverse effect from FEMA's challenged actions.  Attached Document 1-1 at 1-61.

75.     As shown in the attached declarations:

(a) Plaintiffs live in low-income households that have difficulty affording home repairs;

(b) Plaintiffs own the homes where they lived during the disaster;

(c) Plaintiffs were inside their homes and watched while Disaster No. 4223, 4245, or 4272 caused serious damage to their homes;

(d) Plaintiffs applied to FEMA for IHP assistance;

(e) Plaintiffs attended inspections on their homes that were conducted by independent contractors; and

(f) FEMA issued final decisions denying home repair assistance to Plaintiffs on grounds of insufficient damage, or granting far less assistance than Plaintiffs needed to make their

homes safe, without explaining to Plaintiffs what eligibility standards FEMA applied to decide their applications, and what facts that produced FEMA's decision.

76.     Each FEMA decision to provide, limit, or deny housing repair assistance under 42 U.S.C. § 5174(c)(2) is a final agency action that is reviewable under 5 U.S.C. § 704.

77.     FEMA's failure to publish and apply ascertainable standards for its housing repair assistance decisions proximately causes ongoing irreparable injury to the individual Plaintiffs and their families, the organizational Plaintiff's members, and the organizational Plaintiff itself in the form of danger to health, displacement, and unrecoverable costs.

## CAUSES OF ACTION

78.     Plaintiffs incorporate Paragraphs 1-77 above as if repeated to support each of the following four causes of action.

79.     Each of the following four causes of action is brought pursuant to the APA's judicial review provisions, which empower this Court to issue all injunctive relief necessary to secure FEMA's compliance with federal statutes.  5 U.S.C. § 706(2)(C) (substance); *id*. at § 706(2)(D) (procedure).

80.     Plaintiffs are harmed by FEMA's actions described in each of the following four causes of action by (a) diminished eligibility for repair assistance; and (b) increased difficulty in knowing whether and how to challenge FEMA's factual and legal determinations on appeal. Plaintiffs have no adequate remedy at law to redress their injuries.

**Count I:      FEMA Violates 42 U.S.C. § 5174(j) by Failing to Adopt Regulations Needed to Carry Out IHP**

81.     Congress decrees that FEMA "shall prescribe rules and regulations to carry out [IHP], including criteria, standards, and procedures for determining eligibility for assistance."  *Id*. at § 5174(j).

18

82.     On their face, FEMA's IHP regulations at 44 C.F.R. § 206.110-19 do not satisfy the

requirement stated in 42 U.S.C. § 5174(j) because these regulations do not state eligibility

standards in sufficient detail to permit FEMA to "carry out" IHP.

83.     No one can read FEMA regulations at 44 C.F.R. § 206.110-19 and discern how FEMA

decides who will receive disaster assistance, and how much each family will receive.

Consequently the text of 44 C.F.R. § 206.110-19 alone proves that FEMA must use unpublished

rules to decide eligibility for disaster assistance.

84.     The D.C. Circuit has repeatedly held that agencies may not circumvent statutes requiring

regulations by adopting general text that is only clarified in internal policy manuals that are not

subject to regulatory process.  *See Ethyl Corp. v.* EPA, 306 F.3d 1144, 1146-50 (D.C. Cir. 2002);

*MST v. U.S. Dept. of Transp.*, 108 F.3d 401, 402-03 (D.C. Cir. 1997); *Public Citizen v. Nuclear*

*Reg. Comm'n,* 901 F.2d 147, 158 (D.C. Cir. 1990).

85.     Other agencies have proved that housing standards may be produced in regulations.  See

7 C.F.R. §§ 3560.103, *et seq.* (USDA Rural Housing Standards), 20 C.F.R. §§ 654.404, *et seq.*

(DOL Migrant Labor Housing Standards); 24 C.F.R. § 982.401, *et seq.* (HUD Housing Quality

Standards), 29 C.F.R. § 1910.142 (OSHA Temporary Housing Standards).

### Count II:      FEMA Violates 42 U.S.C. § 5151(a) by Failing to Adopt Regulations That Insure Equitable and Impartial IHP Administration

86.     Congress requires FEMA to issue regulations that "include provisions for insuring that ...

the processing of applications, and other relief and assistance activities shall be accomplished in

an equitable and impartial manner, without discrimination on the grounds of ... economic status."

87.     On their face, FEMA's IHP regulations at 44 C.F.R. § 206.110-19 do not "insure"

equitable and impartial administration as required by § 5151(a) because the regulations are so

vague that they cannot be administered consistently.

88.     On their face and as applied, FEMA's IHP regulations at 44 C.F.R. § 206.110-19 do not "insure" equitable and impartial administration without discrimination on the basis of economic status, as required by § 5151(a) because they:

(a) do not state a consistent standard of proof that inspectors must apply to determine which damages are disaster-related, allowing some inspectors to use a preponderance standard while others use a beyond-doubt standard;

(b) define "habitability" so broadly that it is subject to vastly inconsistent administration;

(c) fail to consider applicants' claims as to what damage was caused by the disaster, including failure to ask applicants and failure to require inspectors to record any reasons they have for accepting or rejecting applicants' claims;

(d) impose presumptions in favor of pre-existing damage findings that disproportionately restrict assistance for low-income families; and

(e) require applicants to expend resources that they may not have as a condition of presenting an appeal.

**Count III:     FEMA Violates 42 U.S.C. § 5189a(c) by Failing to Adopt Regulations That Provide for Fair and Impartial Consideration of Appeals**

89.     Congress decrees that FEMA "shall issue rules which provide for the fair and impartial consideration of appeals" from any "decision regarding eligibility for, from, or amount of [disaster] assistance." *Id.* at § 5189a(c).

90.     On their face and as applied, FEMA's IHP regulations at 44 C.F.R. § 206.110-19 do not provide for the fair and impartial consideration of appeals because they:

(a) do not prevent FEMA from implementing secret rules that restrict appeals, which puts disaster survivors to the trouble of appeal even when FEMA has secretly doomed certain appeals from the start;

(b) require applicants to state the reasons for appeal, and do so under oath and on pain of criminal penalty, before FEMA has ever explained the reasons, facts, and law that produced its adverse decision;

(c) require impossible actions, including contractor estimates and statements as to disaster-relatedness, that may not be obtainable as a condition of appeal; and

(d) permit appeal costs to be imposed on disaster survivors who cannot afford those costs.

**Count IV:     FEMA Violates 5 U.S.C. § 552(a)(1) by Using Unpublished Rules that Adversely Affect Applicants**

91.     Federal agencies must publish in the federal register all of their substantive and procedural rules and policy statements.  5 U.S.C. § 552(a)(1)(B)-(E).

92.     "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  5 U.S.C. 552(a)(1).

93.     FEMA used many substantive and procedural rules and policy statements to decide Plaintiffs' IHP applications, none of which were published in the Federal Register.

94.     Plaintiffs never had actual and timely notice of any of the rules and policy statements that FEMA applied to decide their applications for IHP assistance.

95.     FEMA's use of unpublished rules and policy statements adversely affects Plaintiffs by narrowing eligibility for disaster assistance and by impeding their ability to challenge FEMA's findings and conclusions on appeal.

**PRAYER**

96.     WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

(a) pursuant to D.D.C. Local Rule 7(n)(1), an order that FEMA and DHS timely produce the complete administrative record showing all documents that Defendants rely upon to

defend their actions challenged in this lawsuit, including without limitation documents that show the following as to Plaintiffs' applications for IHP assistance:

      (1) all facts and evidence gathered by FEMA;

      (2) all substantive and procedural rules and policies applied by FEMA; and

      (3) how FEMA applied each standard to produce its decisions;

(b) an injunction requiring DHS and FEMA to promulgate regulations that state all standards that FEMA uses to decide eligibility for disaster assistance as required by 42 U.S.C. §§ 5151(a), 5174(j), and 5189a(c);

(c) an injunction that prevents FEMA from using any unpublished rules to decide disaster assistance applications;

(d) an order remanding all applications for home repair assistance following Disaster Nos. 4223, 4245, and 4272 to FEMA for its reconsideration without use of any rules that were not published when FEMA originally decided the applications;

(e) an order that Defendants pay Plaintiffs' litigation costs and attorney fees; and

(f) all other relief that the Court deems just and proper to ensure that FEMA has in place policies, practices, and  procedures to ensure that applicants are timely advised of the grounds for FEMA's disaster assistance decisions in sufficient detail to permit applicants to fairly challenge those decisions on appeal.

Respectfully submitted,
TEXAS RIOGRANDE LEGAL AID, INC.

September 15, 2016

_Jerome Wesevich_

Jerome Wesevich
    D.D.C. Attorney No. TX0125
Tracy Figueroa
    Texas Bar No. 24032923
Linley Boone-Almaguer
    Texas Bar No. 24045528
Kelsey Snapp
    Texas Bar No. 24083882
Peter McGraw
    Texas Bar No. 24081036
Christine Dutko
    Texas Bar No. 24097637
1331 Texas Avenue
El Paso, Texas 79901
(915) 585-5120
jwesevich@trla.org

*Attorneys for Plaintiffs*


## CERTIFICATE OF INDIGENT REPRESENTATION

In accord with D.D.C. Local Rule 83.2(g), all attorneys signing this pleading certify that they are members in good standing of the bar of the Texas Supreme Court, and that they are employed by Texas RioGrande Legal Aid, Inc. to represent indigent clients at no cost to the clients, including all Plaintiffs named in the above lawsuit.

/s/

Jerome Wesevich
Tracy Figueroa
Linley Boone-Almaguer
Kelsey Snapp
Peter McGraw
Christine Dutko